**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Ivan Mosi Pickens

     v.                              Civil No. 14-cv-028-SM

Judy Baker, Jason Goyette, Keith Griffin,
Ralph Jesseman, Howard Kelley, Robert King,
Michael McCann, Edward McFarland, Terry Oliver,
Michael Wedge, and David Wilson

**REPORT AND RECOMMENDATION**

Before the court is the motion for summary judgment (doc. no. 136), filed by New Hampshire Department of Corrections ("DOC") Nurse Practitioner Judy Baker, and current and former DOC corrections officers Jason Goyette, Keith Griffin, Ralph Jesseman, Robert King, Michael McCann, Edward McFarland, Terry Oliver, Michael Wedge, and David Wilson.[1]  Defendants seek summary judgment on all claims asserted against them. Plaintiff, Ivan Mosi Pickens, objects (doc. no. 138).

For reasons set forth below, the district judge should grant defendants' summary judgment motion (doc. no. 136) and direct entry of judgment for defendants on all claims.

---

[1] The remaining defendant, former DOC employee Howard Kelley, has not been served and has not appeared in this action.

Additionally, the district judge should dismiss, without
prejudice, the claims against the remaining defendant, Howard
Kelley, pursuant to Fed. R. Civ. P. 4(m).  The court should deny
as moot Pickens's petition for a writ of habeas corpus ad
testificandum (doc. no. 168) and close the case.

## Background

At all times relevant to consideration of the summary
judgment motion, Pickens was an inmate at the Northern New
Hampshire Correctional Facility ("NCF") in Berlin, New
Hampshire.  Pickens arrived at NCF on August 9, 2011, after his
transfer from the New Hampshire State Prison ("NHSP") in
Concord.  See Doc. No. 138-5.  That afternoon, Pickens was
assigned to a cell without a cellmate in the NCF Closed Custody
Unit ("CCU").  See id.; Ivan Mosi Pickens Dep., Apr. 22, 2015,
Defs.' Ex. B ("Pickens Dep."), at 21 (doc. no. 136-3, at 6).

NCF officers conduct rounds to count inmates in the CCU.
The last CCU inmate "standing count" on August 9, 2011, occurred
at 8:30 p.m., and the last count of the day occurred at 11:15
p.m.  See NCF Rounds Log, Defs.' Ex. E-3 ("Rounds Log") (doc.
no. 136-20, at 1-2); Michael Wedge Aff., July 29, 2015, Defs.'
Ex. F, ¶ 7 (doc. no. 136-22, at 1-2); Keith Griffin Aff., July

29, 2015, Defs.' Ex. E, ¶ 8 (doc. no. 136-17, at 2).  The August
9 evening distribution of medication to CCU inmates, known as
the "D med call," occurred before the last count of the day, at
approximately 9:40 p.m.  See Rounds Log (doc. no. 136-20, at 1-
2).  During med calls, an officer in the CCU control room opens
cell doors of CCU inmates receiving medications, to allow them
to receive them in the hall under the supervision of "floor"
duty CCU corrections officers.  See id.; Ralph Jesseman Aff.,
July 30, 2015, Defs.' Ex. H ("Jesseman Aff."), ¶¶ 5-6 (doc. no.
136-26, at 1).  Pickens's cell door was opened for the August 9
D med call, although, Pickens asserts, Pickens's name was not on
the D Med call list.  See Pickens Dep., at 37-38 (doc. no. 136-
3, at 10-11).

    After Pickens's cell door had been opened, Pickens was
attacked in his cell by other inmates.  See Pickens Dep. at 37-
39 (doc. no. 136-3, at 10-11).  Pickens's attackers beat him
about the head and torso, causing injuries including knocked out
teeth, a broken jaw, and a fractured eye socket, leaving him
semi-conscious for a period of time.  See Pickens Dep. at 46-49
(doc. no. 136-3, at 12-13); Doc. No. 136-21, at 2-3; Doc. No.
137-12, at 7 (Androscoggin Valley Hospital ("AVH") Emergency
Room Evaluation) (Bates 000158); Doc. No. 137-12, at 23

3

(Dartmouth Hitchcock Medical Center ("DHMC") Progress Notes, Sept. 6, 2011) (Bates 000492); Pickens Dep. at 83 (doc. no. 136-3 at 22).

Pickens, an African American, maintains that his assailants were members of a violent white supremacist prison gang, known as the Brotherhood of White Warriors ("BOWW"). In particular, Pickens accuses inmate Jonathan Stafford, a CCU inmate on August 9, known by DOC officials to be associated with BOWW. See Pickens Dep. at 38-39 (doc. no. 136-3, at 11). Stafford's CCU cell on August 9 was on a different floor than Pickens's. It is standard procedure for CCU officers to keep inmates from different tiers separated. See Pickens Dep. at 23-24 (doc. no. 136-3, at 7); Jesseman Aff. ¶ 11 (doc. no. 136-26, at 2).

Corrections Officer ("C.O.") Keith Griffin was the first NCF officer to respond to Pickens after the assault. At 11:15 p.m. on August 9, while conducting the last count of the day, Griffin saw that Pickens was sitting on the end of his bed with a swollen face and other injuries. See Doc. No. 136-21, at 2. Pickens was transported to the AVH Emergency Department that night, where he was evaluated by an emergency room physician, who consulted by phone with a DHMC plastic surgeon. See Pl.'s (Proposed) Stip. of Fact ¶ 2 (doc. no. 162, at 10). Pickens was

4

discharged to the NCF Health Services Center on August 10, 2011, with AVH discharge instructions stating that Pickens should be scheduled for a plastic surgery consultation at DHMC in "5-7 days."  Doc. No. 137-12, at 8 (Bates No. 000159); Pickens Dep. at 67 (doc. no. 136-3, at 18).

On August 10, 2011, NCF Nurse Practitioner Judy Baker reviewed the AVH records, met with Pickens, and issued an order directing that a DHMC plastic surgery consultation be scheduled for Pickens for August 15 or 16, 2011.  Doc. No. 137-12, at 3 (Consult Order, Aug. 10, 2011) (Bates No. 000154); Doc. No. 137-10, at 24 (Bates No. 000085); Judy Baker Aff., July 29, 2015 ("Baker Aff.") ¶ 11 (doc. no. 136-52, at 2); Pickens Dep. at 64 (doc. no. 136-3, at 17); Doc. No. 137-11, at 14 (DOC Progress Notes, Aug. 10, 2011) (Bates No. 000118).  Baker placed her consult order into an NCF outbox for delivery to the NCF transportation team, for the plastic surgery appointment to be scheduled.  See Baker Aff. ¶ 11 (doc. no. 136-52, at 2).  The DOC has designated the transportation team to serve as the appointment coordinator for outside medical appointments, with assistance from the Health Unit Coordinator, as needed.  See DOC Policy and Procedure Directive ("PPD") 6.15(IV)(A) (doc. no. 144-5, at 1).  Baker was on vacation from August 12 through

August 28, and was out of the office again from August 31 through September 5.  See Baker Aff. ¶ 13 (doc. no. 136-52, at 2); Doc. No. 137-13, at 1-3 (DOC Time Sheet).

The record lacks direct evidence of the status of Baker's August 10 consult order from the time Baker put it into an outbox until August 16, when NCF transport officer Michael McCann processed the order by calling DHMC to request the first available plastic surgery appointment for Pickens.  See Aff. of Michael McCann, July 30, 2015 ("McCann Aff.") ¶ 4 (doc. no. 136-43, at 2); Pickens Dep. at 69 (doc. no. 136-3 at 18).  DHMC offered an appointment with plastic surgeon Dr. Gary Freed on August 31, and McCann scheduled that appointment on Pickens's behalf.  See McCann Aff. ¶ 4 (doc. no. 136-43, at 2).  Seeking an earlier appointment for Pickens, the NCF Nursing Supervisor called DHMC on August 22, but DHMC was unable to offer an earlier appointment with Dr. Freed.  See Doc. No. 137-11, at 10 (DOC Progress Notes, Aug. 22, 2011) (Bates No. 000114).

NCF transport officers brought Pickens to Dr. Freed's office for his August 31 appointment.  Dr. Freed examined Pickens and concluded that plastic surgery was needed to repair a right orbital floor fracture.  See Doc. No. 137-12, at 5 (Progress Note, Gary Freed, MD, Aug. 31, 2011) (Bates No.

000156).  Dr. Freed was concerned about the delayed timing of
Pickens's appointment, relative to his injuries.  Pickens
testified that Dr. Freed asked him on August 31 why it took so
long for him to come in, and also that Dr. Freed said Pickens
had been a "no-show" for two earlier DHMC appointments.[2]  Pickens
Dep. at 80-81 (doc. no. 136-3 at 21).  After the August 31
appointment, Dr. Freed called the NCF Health Services Center and
spoke with NCF Nurse Tina Pageau, who noted in Pickens's medical
records that Dr. Freed was upset with the scheduling of
Pickens's appointments and wanted to speak to the nurse
practitioner or someone in charge.  See Pl.'s Proposed Stip. ¶¶
3-4 (doc. no. 162, at 10); Doc. No. 137-11, at 7 (DOC Progress
Notes, Aug. 31, 2011) (Bates No. 000111).  Nurse Pageau's notes
say she gave Dr. Freed the number of the "OIC" (officer in
charge), and that she called that officer to let him know Dr.
Freed might call him.  See Doc. No. 137-11, at 7 (DOC Progress
Notes, Aug. 31, 2011) (Bates No. 000111).

  Pickens underwent surgery to repair his right eye socket at
DHMC on September 6, 2011.  Pickens Dep. at 67-68 (doc. no. 136-

---

[2] Documents in the record generated by DHMC do not show that any
earlier appointments had been scheduled for Pickens at DHMC,
prior to the August 31 appointment.  See Doc. No. 136-45, at 3
(DHMC Appointment Detail for Pickens, Aug. 31, 2011).  See also
Ltr. from Shannon Creighton to Atty. Cusack, Feb. 27, 2015
(Defs. Ex. P-1).

3, at 18).  A DHMC appointment coordinator set up a follow-up
appointment for 3 p.m. on September 14.  On September 13, Nurse
Baker prepared a consult order for that appointment.  <u>See</u> Doc.
No. 137-11, at 39 (Bates No. 000147) (DOC Consult Order); Doc.
No. 137-12, at 1 (DHMC Discharge Summary, Sept. 6, 2011) (Bates
No. 000152).  The consult order directed that an appointment be
scheduled at the time and date requested by DHMC (September 14,
2011, at 3 p.m.), as a post-surgical follow up to surgery on
September 6 for facial trauma and multiple fractures.  <u>See</u> Doc.
No. 137-11, at 39 (Bates No. 000147).

     DHMC called NCF on September 14 to say that Pickens's
3 p.m. appointment had to be moved ahead one hour, to 2 p.m., to
accommodate Dr. Freed's surgery schedule.  <u>See</u> David Wilson
Aff., July 29, 2015 ("Wilson Aff.") ¶ 13 (doc. no. 136-35, at
4); Doc. No. 136-45, at 5 (DHMC Appointment Detail, Sept. 14,
2011).  NCF transport officer Sgt. David Wilson, who spoke with
the DHMC appointment coordinator, cancelled the 2 p.m.
appointment and rescheduled it for September 27, the next
available appointment with Dr. Freed offered by DHMC.  <u>See</u> Pl.'s
(Proposed) Stip. of Facts ¶ 6 (doc. no. 162, at 11); Doc. No.
137-10 (DOC Progress Notes, Sept. 14, 2011) (Bates No. 000103);
Doc. No. 136-45, at 5 (DHMC Appointment Detail, Sept. 14, 2011).

Wilson's sworn statement is that he sincerely believed NCF
transport officers could not bring Pickens on time to a 2 p.m.
appointment at DHMC in Lebanon, New Hampshire, when Wilson
rescheduled the 2 p.m. appointment.  Wilson Aff. ¶ 13 (doc. no.
136-35, at 4).  NCF officers in a van leaving the facility with
Pickens on September 14 returned to NCF at 11:45 a.m., after the
appointment was cancelled.  See Doc. No. 137-15 (NCF Gatehouse
Shift Log, Sept. 14, 2011).

Pickens's first post-surgical follow-up appointment with
Dr. Freed occurred on September 27.  Dr. Freed's September 28
notes state that Pickens was doing well, but that he had a tight
right lower eyelid.  See Doc. No. 137-12, at 31-32 (DHMC
Progress Notes, Gary Freed, MD, Sept. 28, 2011) (Bates No.
000500-501).  Pickens had no complaints of visual issues, dry
eye or cosmetic deformity, and was both satisfied with his
appearance and also unwilling to undergo surgery to correct what
Dr. Freed perceived to be "subtle enophthalmos."  See id. at 32
(Bates No. 000501).  Dr. Freed concluded that a second post-
surgical follow-up appointment was needed in three months,
during which Dr. Freed would be able to ensure that Pickens's
right eyelid did not continue to retract, and that Pickens did
not develop dry eye issues from incomplete closure.  See id.

On December 1, 2011, Pickens was seen again by Dr. Freed, see Baker Aff. ¶ 20 (doc. no. 136-52, at 3).  Dr. Freed noted a slight enophthalmos (2 mm), and further noted that Pickens's right lower lid was supple, that Pickens was doing well, and that his complaints of episodic diplopia could not be elicited on exam.  See Doc. No. 137-12, at 32 (DHMC Progress Notes, Gary Freed, MD, Dec. 5, 2011) (Bates No. 000501).  Dr. Freed concluded that an "optho" [sic] follow up seemed appropriate. See id. at 33 (Bates No. 000502).

Pickens filed this action in 2014, seeking damages under 42 U.S.C. § 1983, for claims asserting violations of his rights under the Eighth and Fourteenth Amendments, relating to the August 9 assault and delays in his receipt of medical care in August and September 2011.  All of the defendants who have been served in this action have now jointly moved for summary judgment.  The movants contend that judgment should be entered as a matter of law for defendants on the merits of each claim, and that the action must also be dismissed in accordance with the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), because Pickens did not exhaust administrative remedies as required by PPD 1.16.  Now fully briefed (see Doc. Nos. 136, 137, 138, 140, 141, 144, and 145), the summary judgment motion

has been referred to this magistrate judge for a report and
recommendation, pursuant to LR 72.1.

## Discussion

### I.   Summary Judgment Standard

"'Summary judgment is appropriate when there is no genuine
issue of material fact and the moving party is entitled to
judgment as a matter of law.'"  Ponte v. Steelcase, Inc., 741
F.3d 310, 319 (1st Cir. 2014) (citation omitted); see also Fed.
R. Civ. P. 56(a).  When ruling on a motion for summary judgment,
the court must "view[] the entire record 'in the light most
hospitable to the party opposing summary judgment, indulging all
reasonable inferences in that party's favor.'"  Winslow v.
Aroostook Cty., 736 F.3d 23, 29 (1st Cir. 2013) (citation
omitted).  "All properly supported material facts set forth in
the moving party's factual statement may be deemed admitted
unless properly opposed by the adverse party."  LR 56.1(b).

"'The nonmovant may defeat a summary judgment motion by
demonstrating, through submissions of evidentiary quality, that
a trialworthy issue persists.'"  Sánchez-Rodríguez v. AT&T
Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012) (citation
omitted).  "'Conclusory allegations, improbable inferences, and

unsupported speculation, are insufficient to establish a genuine dispute of fact.'"  Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 146 (1st Cir. 2013) (citation omitted).

## II.  Eighth Amendment Endangerment (Claims 1(a) and (b))

Defendants move for judgment as a matter of law on the merits of Pickens's Claims 1(a)-(b), which allege that defendants, acting with deliberate indifference, failed to protect Pickens from a substantial risk of serious harm.[3] Defendants assert that Pickens has failed to present a triable issue with respect to the subjective aspect of Pickens's Eighth Amendment failure to protect claim.

---

[3]This court has identified Claim 1 as follows:

> Corrections Officers Terry Oliver, Keith Griffin, Ralph Jesseman, Edward McFarland, and Michael Wedge failed to protect Pickens, in violation of his Eighth Amendment rights when, on August 9, 2011, with deliberate indifference to a substantial risk of serious harm to Pickens, defendants took action that allowed Jonathan Stafford, a known member of a white supremacist prison gang, to gain access to Pickens's cell and to assault Pickens, in that:
>
> > a.   Jesseman, Griffin, McFarland, Oliver, and Wedge caused upstairs cell doors and Pickens's door to be opened simultaneously, contrary to standard operating procedures; and
> >
> > b.   Jesseman, Griffin, McFarland, and Wedge failed to make rounds for more than four hours, contrary to standard operating procedures.

A.   <u>Eighth Amendment Standard</u>

Under the Eighth Amendment, prison officials have a "constitutional duty 'not to be deliberately indifferent to the risk to prisoners of violence at the hands of other prisoners.'" <u>Mosher v. Nelson</u>, 589 F.3d 488, 493 (1st Cir. 2009) (citation omitted).  To state an Eighth Amendment failure to protect claim, the prisoner must show that a prison official acted with "'deliberate indifference'" to a serious risk to the prisoner's health or safety.  <u>Giroux v. Somerset Cty.</u>, 178 F.3d 28, 32 (1st Cir. 1999) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 828 (1994)).

An Eighth Amendment claim for failure to protect has both an objective and a subjective component.  <u>See</u> <u>Mosher</u>, 589 F.3d at 493.  With respect to the subjective component of a failure to protect claim, the plaintiff must show that defendants had a "sufficiently culpable state of mind," namely, "'deliberate indifference' to an inmate's health or safety." <u>Calderón-Ortiz v. LaBoy-Alvarado</u>, 300 F.3d 60, 64 (1st Cir. 2002) (quoting <u>Farmer</u>, 511 U.S. at 834).  Proving deliberate indifference requires proof of more than mere negligence as to a risk of harm.  <u>Wilson v. Seiter</u>, 501 U.S. 294, 305 (1991).  Deliberate indifference requires a showing that a prison official was

13

subjectively aware of a substantial risk of serious harm to an inmate, and disregarded that risk.  <u>Farmer</u>, 511 U.S. at 828-29.

    B.   <u>Deliberate Indifference</u>

        1.   <u>Opening of Pickens's Cell and Frequency of Rounds</u>

Pickens has alleged that defendant C.O. Terry Oliver and other guards, in "cahoots" with white supremacist inmates, caused Pickens's cell door to be open during D Med call for the purpose of allowing inmates to attack Pickens.  Pickens's allegations regarding why his cell door was opened, however, are purely speculative.  Defendant Jesseman has filed a sworn statement, consistent with DOC records, indicating that he was the control room officer at the relevant time on August 9; he has further averred that while he does not specifically recall opening Pickens's cell door for the D Med Call, if he did so while other inmates from a different tier were out, it would have been an inadvertent act.  <u>See</u> Jesseman Aff. ¶¶ 8, 11 (doc. no. 136-26).  Jesseman stated that he would not have opened Pickens's door in response to any inmate's request, even if the other inmate stated that Pickens needed to receive medication, as Jesseman would not open a cell door unless there was a reasonable and/or legitimate penological objective for doing so. <u>See id.</u> ¶¶ 3, 9-10.

It is undisputed that defendant McFarland left NCF before Pickens was assaulted.  See Lt. Edward McFarland Aff., July 22, 2015 ("McFarland Aff.") ¶ 3 (doc. no. 136-24, at 1).  There is no evidence that McFarland had subjective knowledge that Pickens's door would be opened during the D Med Call, or that he was deliberately indifferent to any known risk that Pickens would otherwise be subjected to a substantial risk of serious harm in his absence.  Accordingly, McFarland's motion for summary judgment should be granted on that basis.

NCF records corroborate defendant Oliver's sworn statement that he, too, left the prison hours before the assault.  See Terry Oliver Aff., July 24, 2015 ("Oliver Aff.") ¶ 2 (doc. no. 136-28, at 1); NCF Time Sheet, Aug. 9, 2011 (doc. no. 137-9). Accepting as true Pickens's testimony that he saw Oliver in the control room in the relevant time period does not change the result with respect to Oliver's motion for summary judgment, however, as there is no evidence suitable for consideration on summary judgment that Oliver or any other NCF officer caused Pickens's cell door for the D Med Call to be opened at any other inmate's request.

The opening of Pickens's cell door during D Med Call, if proven, might be deemed negligent on this record, but without

15

more, that failure does not give rise to a triable issue of
deliberate indifference.  Similarly, the other alleged
departures from standard procedures asserted in Pickens's
deposition or in his declaration, for which he might be able to
establish a foundation – namely, the claimed failure of the
control room officer to keep Pickens's cell door closed during
the August 9 D Med Call, the alleged failure of Officers Griffin
and Wedge to conduct rounds at the frequency they logged
contemporaneously and attested to in their sworn statements, see
Doc. No. 136-20, at 1-2 (Bates No. 000009-10); Griffin Aff. at
¶ 8 (doc. no. 136-17, at 2); Wedge Aff. at ¶¶ 4, 8 (doc. no.
136-22, at 1-2); and the alleged failure of defendants to keep
Stafford, on a different tier, separated from Pickens – even if
proven, would not give rise here to a genuine issue of fact
regarding any defendant's state of mind, sufficient to allow
Claim 1 to proceed to trial.

### 2.  Stafford, Lavoy, and Racial Tension

The record before this court does not present a genuine
issue regarding whether any defendant officer had subjective
knowledge that Stafford, or any other inmate in the CCU on
August 9, presented a substantial risk of harm to Pickens.
Pickens alleges such knowledge existed, because, in 2010, when

16

Pickens was previously incarcerated at NCF, he testified, he was involved in an "incident" with an inmate Pickens identifies as "Jamie Lavoy," whom Pickens describes as a "white racist." Pickens Dep. at 6-7 (doc. no. 136-3, at 3).  The evidence before this court does not show, however, that any defendant to Claim 1 knew about the Lavoy incident, that Lavoy was affiliated with BOWW or Stafford, that Lavoy was in the CCU on August 9, or that any defendant subjectively connected an incident between Lavoy and Pickens with an elevated risk of harm to Pickens presented by any CCU inmate on August 9, 2011.

Additionally, Pickens testified, when he was in the NHSP Special Housing Unit in Concord from June 2011 through August 2011, he overheard inmate Stafford make a nonspecific indirect threat against African Americans.  Pickens has not shown, however, that any defendant in this case was aware of that indirect threat.  The record does not include any DOC record documenting the existence of such a threat, and there is no evidence that any defendant knew that Pickens had specific concerns about Stafford or BOWW prior to the assault.  It is undisputed that DOC's "keep separate" list for Pickens on August 9, 2011, included neither Stafford, nor any other inmate celled in the NCF CCU on that date.  See William Daniel Hammer Aff.,

17

July 28, 2015, ¶¶ 6-8 (doc. no. 136-13).  <u>Cf.</u> DOC Offender
Summary Report, Ivan Mosi Pickens (doc. no. 137-1).  There is no
evidence in this case that any defendant to Claim 1(a) or 1(b)
witnessed or otherwise knew about Pickens's prior incidents with
any inmate in the CCU on August 9.

Pickens has also asserted in an unsworn filing that there
was "racial tension" in the CCU.  An unsworn averment is not
appropriately considered on summary judgment.  Even if that fact
could be proven, it is not evidence that guards were
subjectively aware of an elevated risk of serious harm to
Pickens on that date.

By the same token, plaintiff's claim of a conspiracy
between white supremacists and defendants is purely speculative
and conclusory.  A bald assertion unsupported by any evidence,
that guards collaborated with violent inmates to harm Pickens,
does not give rise to a genuine issue of material fact, as to
the officers' motive or state of mind sufficient to allow an
Eighth Amendment endangerment claim to proceed to trial.
Accordingly, the district judge should grant defendants' motion
for summary judgment on Claims 1(a) and 1(b).

III. <u>**Equal Protection (Claims 2(a)-(b))**</u>

Defendants move for judgment as a matter of law on

18

Pickens's equal protection claims, Claims 2(a)-(b), alleging

racially discriminatory delays in Pickens's receipt of medical

treatment.[4]  Defendants contend that there is not a triable issue

as to Pickens's equal protection claims, and that they are

entitled to judgment as a matter of law on those claims.  In

addition, defendants assert that Pickens did not exhaust his

administrative remedies on his equal protection claims relating

to delays in his receipt of care from a plastic surgeon.

_____

[4] This court has identified Claims 2(a)(i)-(ii) and 2(b)(i)-(ii)
as follows:

> Defendants NCF Nurse Judy Baker, Cpl. Jason Goyette,
> Corrections Officer ("C.O.") Howard Kelley, C.O. Robert
> King, C.O. Michael McCann, and Sgt. David Wilson violated
> Pickens's Fourteenth Amendment equal protection rights by
> discriminating against Pickens on the basis of his race, in
> that, without similarly cancelling appointments, failing to
> transport, or otherwise delaying the care provided to a
> white inmate, Stephen Rich, who had been less severely
> injured in an inmate assault one week after Pickens:
>
>> a.   Baker cancelled or delayed Pickens's appointments
>> for surgery and post-surgical care, (i.) in August
>> 2011, and (ii.) on September 14, 2011; and
>>
>> b.   Goyette, Kelley, King, McCann, and Wilson did not
>> cause Pickens to be transported to scheduled plastic
>> surgery and follow-up appointments, (i.) in August
>> 2011 and/or (ii.) on September 14, 2011, causing
>> delays in his treatment.

A.   Equal Protection Standard

The Fourteenth Amendment's Equal Protection Clause requires states to treat similarly-situated people in a similar manner. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).  Generally, to establish an equal protection claim, a plaintiff must demonstrate that, (1) compared with others similarly situated, he was selectively treated, and (2) that the selective treatment was motivated by purposeful discrimination on some improper basis, such as plaintiff's membership in a particular race or religion.  See Hernandez v. New York, 500 U.S. 352, 360 (1991).  Proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977).

B.   Nurse Judy Baker (Claim 2(a))

Defendants move for summary judgment on the equal protection claim against Nurse Baker.  The record before the court includes no submission of evidentiary quality that disputes the key facts asserted by Baker in her sworn statement. Specifically, Baker asserts that, on August 10, 2011, she reviewed the AVH discharge instructions, met with Pickens, and ordered that he be scheduled for a consult with the DHMC plastic

surgeon on August 15 or 16.  There is nothing in the record to challenge the validity of Baker's sworn statement that she placed the August 10 consult order into an outbox for delivery to the NCF transportation team.  Baker was out on leave for most of the rest of August 2011, through September 6, 2011.  Baker's declaration further states that she treats inmates appropriately based on their medical needs, and that race did not influence her actions and decisions affecting the course of Pickens's treatment in August and September 2011.

The record is devoid of evidence that Baker has handled a consult order for any white inmate differently than she handled Pickens's.  Moreover, there is no evidence that Baker influenced the timing of treatment for either Pickens or any white inmate, while she was on leave from August 11 through August 29, and from August 31 through September 6.  There is also no evidence that Baker was are of the rescheduling of Pickens's follow-up appointment at the time it occurred, or that she took steps to expedite the scheduling of any other similarly situated inmate of a different race after the transportation team cancelled and rescheduled an appointment for a post-surgical follow-up.

Pickens has specifically asserted that a white inmate, Stephen Rich, received prompter attention for injuries Rich

21

suffered in a fight on August 15, 2011, a week after the assault

on Pickens.  Pickens testified at his deposition that after Rich

was injured on August 15, Rich was seen by the Catholic Medical

Center ("CMC") plastic surgery group on August 24, 2011.

Pickens Dep. at 71-72 (doc. no. 136-3 at 19).

Even if the court assumed those facts could be proven at

trial, the record does not include sufficient facts from which a

reasonable jury could conclude that Rich and Pickens were

similarly situated, for purposes of the equal protection claim

asserted against Nurse Baker.  A different NCF primary care

provider -- Dr. John Eppolito -- prepared Rich's initial outside

provider consult order, and different outside specialists

treated Rich and Pickens.  The two consult orders were assigned

similar priorities.  See Baker Aff. ¶ 23 (doc. no. 136-52, at

3).  There is no evidence regarding the contents of the consult

order that could undermine Nurse Baker's sworn statement in that

regard.  There is also no evidence in the record regarding the

course of Rich's treatment after the August 24 initial

appointment, from which any factfinder could infer differential

treatment by Baker attributable to each inmate's race.  Nothing

other than Pickens's unsubstantiated speculation lies behind the

claim that alleged racial animus on Nurse Baker's part caused or

contributed to the delay in Pickens's course of treatment.
Therefore, the motion for summary judgment should be granted as
to Claim 2(a).

### C.   Transport Officers (Claim 2(b))

Pickens has offered no evidence raising a trial-worthy
issue regarding whether race discrimination was a motive for any
transport officer's action or inaction affecting the timing of
either Pickens's initial consultation appointment, or his post-
surgical follow-up appointments.  Defendants Jason Goyette,
Robert King, McCann, and Wilson specifically aver that they
performed their transportation team duties as to Pickens without
consideration of his race.  See Aff. of Robert King, July 31,
2015, ¶ 5 (doc. no. 136-50, at 2); Aff. of Jason Goyette, July
29, 2015, ("Goyette Aff.") ¶ 11 (doc. no. 136-41, at 3); McCann
Aff. ¶ 11 (doc. no. 136-43, at 3); Wilson Aff. ¶ 14 (doc. no.
136-35, at 4).

Although the record before the court indicates that Baker's
August 10 consult order was not processed by the NCF
transportation department until August 16, there is no evidence
from which a reasonable factfinder could conclude that Pickens's
race played any role in that delay.  Defendants Wilson, McCann,
and Goyette have submitted sworn statements to this court

23

indicating that under-staffing between August 10 and August 16, the intervening weekend (August 13-14), and other demands on the transportation team's time, explain why Pickens's initial consult order was not processed until August 16.  See Goyette Aff. ¶ 12; Wilson Aff. ¶¶ 3, 6, 8-10; McCann Aff. ¶¶ 3-4. Pickens has offered no submission of evidentiary quality to dispute those explanations for the failure of the NCF transportation team to process Baker's August 10 consult order prior to August 16.

Pickens asserted in his deposition that Rich suffered injuries on Monday, August 15, 2011, and that Rich was seen by the CMC plastic surgery group on August 24 for an initial consult.  Pickens has not presented any information of evidentiary quality, however, to show that the consult order for Rich was processed before Pickens's was processed on August 16, or to dispute the transportation officers' sworn statements that apart from several doctor's appointments scheduled on August 10, staffing issues and other demands on the team's time prevented them from processing any medical appointment consults prior to August 16.

As to Rich's ability to obtain a consult appointment with a CMC provider on August 24, versus Pickens's August 31

24

appointment, the record does not show that the inmates were similarly situated.  The consult orders directed the transportation team to contact different providers at different facilities with, presumably, different availability in their schedules.  In the absence of any evidence from which a jury could conclude that Pickens and Rich were similarly situated but treated differently, as to the processing of their initial consult orders, Pickens has not shown that there is any genuine issue of material fact as to whether race discrimination affected the timing of Pickens's initial appointment with Dr. Freed.

Furthermore, as to the timing of the post-surgical follow-up appointment, Pickens has not presented a trial-worthy issue regarding race discrimination.  Nothing in the record suggests that any transportation officer, including Wilson, harbored racial animus, and there is no indication that Wilson or any other transportation officer managed the appointment schedules and transportation needs of white inmates differently in similar circumstances.  Accordingly, the motion for summary judgment should be granted on Claim 2(b).

D.   PLRA Exhaustion (Claims 2(a)(i) and (b)(i))

Defendants cite the PLRA's administrative exhaustion

25

requirement as an independent ground for granting their motion

for summary judgment on Claims 2(a)(i) and 2(b)(i), which are

Pickens's claims that race discrimination affected the delay in

the scheduling of his August 31 DHMC appointment.  The PLRA

requires an inmate to exhaust all available administrative

processes before filing a federal suit that relates to the

conditions of his or her confinement.  Booth v. Churner, 532

U.S. 731, 734 (2001).  Claims for which available administrative

remedies have not been properly exhausted are subject to

dismissal.  See Medina-Claudio v. Rodríguez-Mateo, 292 F.3d 31,

36 (1st Cir. 2002).

     PPD 1.16 provides for a three-tier exhaustion procedure

applicable to Pickens's circumstances.  An inmate first files an

inmate request slip ("IRS") at the unit level to complain about

an issue, within fourteen days of the incident.  To complete the

exhaustion process under PPD 1.16, the next step is to file a

grievance with the NCF Warden within thirty days after the date

of the unit-level's response to the IRS.  The final step for the

inmate is an appeal of the Warden's decision to the DOC

Commissioner, within thirty days after the date of the Warden's

decision.  See PPD 1.16 ¶¶ II, III(F), IV(A)-(C).  The time

limits are mandatory, but waivers of the time limits may be

granted upon request, pursuant to PPD 1.16.

Pickens filed two IRSs, both dated September 11, 2011, in which he asserted that there were racially discriminatory delays in the scheduling of, and his transport to, his initial appointment at DHMC.  In particular, Pickens asserted that two DHMC appointments had been cancelled prior to August 31, and that a white inmate had been seen by a specialist sooner for less severe and later-acquired injuries.  See Doc. Nos. 136-11, at 1-2 (Defs.' Ex. C-6).

NCF Nurse Ryan Landry responded to both IRSs in writing on September 14, 2011, expressing in one response Landry's belief that Pickens was not a target of race discrimination.  See id. at 2.  Landry's second response instructed Pickens to request a grievance form from NCF C.O. Perreault.  See id. at 1.

The undisputed evidence in this case indicates that Pickens did not appeal Landry's IRS responses to the Warden or the Commissioner concerning delays in scheduling his consultations at DHMC in the relevant time period.[5]  Pickens seeks to excuse

---

[5] Pickens grieved matters relating to his failure to protect claim in September 2011, but that grievance does not raise his claims of racial discrimination and delays in the timing of his August 31 appointment.  Cf. Defs.' Ex. P-4, Doc. No. 137-16 (Grievance Form, Pickens, Sept. 23, 2011); id. (Response to Grievance, Chris Kench, Oct. 4, 2011).

his failure to properly exhaust his remedies relating to the alleged racially discriminatory delay in his initial DHMC appointment by contending: (1) that the grievance process was not designed to deal with claims like his, and that exhaustion would have been futile; and (2) that he received no response to an IRS he submitted on September 20.

An inmate is not excused from grieving issues just because he seeks relief that is not available through the grievance process, so long as the process could provide some relief.  See Booth, 532 U.S. at 736.  There is no "futility" exception to the PLRA exhaustion requirement.  See id. at 741 n.6.  As Pickens could have obtained some relief from the DOC administrative grievance process concerning race discrimination in the scheduling of his plastic surgery consultations, even if it was not the relief he sought, the exhaustion requirement for those claims is not excused.  Furthermore, the fact that prison officials did not respond to Pickens's September 20 IRS is not relevant.  The September 20 IRS did not reiterate Pickens's race discrimination claims regarding the August 31 appointment. Pickens's equal protection claims regarding delays in the initial DHMC appointment are not the subject of any IRS other than the September 11 IRSs answered by Landry.  Pickens's

failure to exhaust available administrative remedies under PPD 1.16 is an independent ground upon which the district judge should grant the motion for summary judgment on Claims 2(a)(i) and 2(b)(i).

## IV.  <u>Eighth Amendment Medical Care (Claims 3(a)-(b))</u>

Defendants move for summary judgment on Pickens's Eighth Amendment medical care claims against Nurse Baker and Sgt. Wilson (Claims 3(a)-(b)).[6]  Defendants assert that Pickens has failed to present a triable issue with respect to the objective and subjective aspects of his Eighth Amendment medical care claims.

### A.  <u>PLRA Exhaustion as to Delays in Initial Consultation</u>

Defendants cite the PLRA's administrative exhaustion

---

[6] This court identified Claims 3(a)(i)-(ii) and 3(b)(i)-(ii), as follows:

Defendant NCF Nurse Judy Baker and Sgt. David Wilson violated Pickens's Eighth Amendment rights in that, with deliberate indifference to a substantial risk of serious harm to Pickens:

a.   Baker cancelled or delayed Pickens's appointments for surgery and post-surgical care for facial injuries, (i.) prior to August 31, 2011, and/or (ii.) on September 14, 2011; and

b.   Wilson did not arrange for Pickens to be transported for surgery and post-surgical care for facial injuries, (i.) prior to August 31, 2011, and/or (ii.) on September 14, 2011.

requirement as one ground for granting their motion for summary judgment on Claims 3(a)(i) and 3(b)(i), which are Pickens's claims that the delay in the scheduling of his August 31 DHMC appointment violated his rights under the Eighth Amendment.

Pickens's September 11 IRSs assert that NCF staff members deliberately delayed Pickens's initial appointment at DHMC, knowing there was a greater chance of irreparable damage to Pickens due to the delay. See Doc. Nos. 136-11, at 1-2 (Defs.' Ex. C-6). Those IRSs are the only IRSs filed within fourteen days of Pickens's August 31 appointment, which address whether the delay manifested deliberate action in the face of a known risk of harm to Pickens. Pickens did not appeal Nurse Ryan Landry's September 14 IRS responses to the Warden or Commissioner, or otherwise satisfy the exhaustion requirement by raising any pertinent grievance to the Warden and Commissioner in the relevant time period. Accordingly, the motion for summary judgment should be granted on Claims 3(a)(i) and 3(b)(i) based on the PLRA.

> B.   Eighth Amendment Medical Claim Standard

Defendants further contend that they are entitled to summary judgment on the merits of all of Pickens's Eighth Amendment claims. The Eighth Amendment protects an inmate from

deliberate indifference to that inmate's serious medical needs. See Farmer, 511 U.S. at 831.  "To succeed on an Eighth Amendment claim based on inadequate or delayed medical care, a plaintiff must satisfy both a subjective and objective inquiry: he must show first, 'that prison officials possessed a sufficiently culpable state of mind, namely one of "deliberate indifference" to an inmate's health or safety,' and second, that the deprivation alleged was 'objectively, sufficiently serious.'" Leavitt v. Corr. Med. Servs., 645 F.3d 484, 497 (1st Cir. Me. 2011).  In the medical care context, a demonstration of "deliberate indifference . . . requires evidence that the failure in treatment was purposeful." Kosilek v. Spencer, 774 F.3d 63, 83 (1st Cir. 2014), cert. denied, 135 S. Ct. 2059 (2015).  "While deliberate indifference may . . . be exhibited by a 'wanton disregard' to a prisoner's needs, such disregard must be akin to criminal recklessness, requiring consciousness of 'impending harm, easily preventable.'" Id. (citations and internal quotation marks omitted).  "'[S]imple medical malpractice'" or negligent conduct generally does not rise to the level of an Eighth Amendment violation. Perry v. Roy, 782 F.3d 73, 79 (1st Cir. 2015) (citation omitted); Leavitt, 645 F.3d at 497.

C.   <u>Nurse Judy Baker (Claim 3(a))</u>

The record contains no evidence suggesting that Nurse Baker
was deliberately indifferent to Pickens's medical needs.  It is
undisputed: (1) that on August 10, 2011, Baker issued an order
for a consultation with a DHMC plastic surgeon, on which she
wrote the dates 8/15 or 8/16 to signify the dates for the
appointments; (2) that DOC policies make the NCF transportation
team responsible for setting up outside provider appointments;
and (3) that Baker put her August 10 consult order into an
outbox for delivery to the transportation team before she was
out of the office for most of the rest of August 2011.  There is
no evidence that Baker was subjectively aware that her August 10
consult order would not yield an initial consultation for
Pickens until August 31; or that Baker was otherwise
subjectively aware of any impending harm to Pickens, easily
preventable by her, with respect to the scheduling of the
initial consult appointment.  Accordingly, Pickens has failed to
show that there is a triable issue as to whether Baker was
deliberately indifferent to Pickens's serious medical needs,
relating to the initial consult in August 2011.

It is further undisputed that Pickens remained under NCF
Health Service Center care while Baker was not at NCF.  There is

no evidence suggesting that Baker was subjectively aware of any substantial risk to Pickens that NCF health providers would not address in her absence.

Finally, the record contains no evidence that Baker acted with deliberate indifference to a substantial risk of serious harm with respect to the timing of Pickens's post-surgical follow-up appointment.  Baker was not generally responsible for scheduling or rescheduling appointments.  There is no evidence that Baker was aware of the decision not to send Pickens to the September 14 appointment at 2 p.m., and there is no evidence that she was subjectively aware of any substantial risk of harm to Pickens that could result from moving the follow-up appointment from September 14 to September 27.  In the absence of such evidence of subjective awareness of a substantial risk of serious harm on Baker's part, there is no triable issue of fact as to whether Baker was deliberately indifferent to Pickens's medical needs.  Accordingly, the motion for summary judgment should be granted as to Claim 3(a).

     D.    Sgt. David Wilson (Claim 3(b))

          1.    August 31 Appointment (Claim 3(b)(i))

Pickens has also failed to show that there is a genuine issue of material fact regarding whether Sgt. Wilson was

33

deliberately indifferent to Pickens's needs for medical appointments and transports in August 2011.  It is undisputed that Wilson was on leave from August 8 through August 14.  See Wilson Aff. ¶ 8 (doc. no. 136-35, at 2).  Wilson's affidavit further states that he was primarily out of the office running transports on August 15 and 16, and there is no evidence to dispute that fact.  There is also no evidence indicating that Wilson knew about the existence of the August 10 consult order during the periods when he was in the office on August 15 or 16.  Lacking any evidence from which a jury could infer Wilson's subjective awareness that the August 10 consult order awaited action by the transportation team prior to August 16, the record does not substantiate that there is a genuine issue of fact regarding whether Wilson was deliberately indifferent, with respect to the August 10 consult order.  Accordingly, the district judge should grant summary judgment on Claim 3(b)(i) against Wilson.[7]

---

[7] Pickens has not moved this court to substitute any other transport officer for Sgt. Wilson, with respect to Claim 3(b)(i).  Even if Pickens had so moved, summary judgment on the claim would be proper under the PLRA, as Pickens did not appeal the September 11 IRS, and did not file any other timely IRS or grievance to the Warden and Commissioner relating to any transport officer's involvement in Pickens's delayed receipt of specialty care prior to August 31.

2.   Post-Surgical Appointment (Claim 3(b)(ii))

With respect to the post-surgical follow-up appointment, Sgt. Wilson's sworn statement is that he cancelled the September 14 appointment, believing that Pickens could not arrive on time for a 2 p.m. appointment, when DHMC told Wilson on September 14 that the 3 p.m. slot was no longer available.  While there is evidence that might undermine a factfinder's confidence in the accuracy of Wilson's time calculation, namely, evidence that the trip can be completed in about two hours and fifteen minutes, there is no evidence that Wilson was subjectively aware that delaying the follow-up appointment to September 27 rather than rushing Pickens to a 2 p.m. appointment subjected Pickens to an avoidable substantial risk of serious harm.  There is no evidence suggesting, for example, that the DHMC appointment coordinator said anything to Wilson regarding the new appointment date when she offered it to Wilson, which could generate a jury question on whether Wilson had the requisite state of mind of deliberate indifference, to allow the Eighth Amendment claim to go to the jury.

Baker's September 13 consult order, which directed the transportation team to schedule the September 14 appointment, stated that a follow-up appointment should be scheduled for

Pickens on September 14 at 3 p.m.  The consult order further
explained that the specified date had been selected by DHMC.
The undisputed evidence shows that DHMC offered September 27 as
the next available date for Dr. Freed to see Pickens, when
Wilson cancelled the 2 p.m. September 14 appointment.  Baker's
consult order does not state any other facts regarding Pickens's
condition or medical needs that, per se, would permit a jury to
conclude that Wilson was aware that delaying the post-surgical
appointment until September 27 subjected Pickens to a risk of
serious harm.

Dr. Freed's notes prepared after the September 27
appointment indicate that Dr. Freed spoke with a supervising
guard about the importance of Pickens attending follow-up
appointments as scheduled.  Nothing in the record, however,
links Wilson with that conversation.  Cf. Leavitt, 645 F.3d at
502 ("to make out a cognizable Eighth Amendment claim against
healthcare providers in their individual capacity, [plaintiff]
must demonstrate that there is sufficient evidence for a
reasonable factfinder to conclude that each . . . defendant was
'aware of facts from which the inference could be drawn that a
substantial risk of serious harm exists,' and that each
defendant did, in fact, 'draw the inference'" (emphasis in

36

Leavitt) (quoting Farmer, 511 U.S. at 837)).  Pickens's
deposition testimony is that Dr. Freed spoke to C.O. McCann;
Pickens has never asserted that Dr. Freed spoke with Wilson, and
there are no NCF documents in the record suggesting Wilson's
awareness of that conversation.

The absence of a jury question regarding Wilson's
deliberate indifference is further manifest in a notation in
Pickens's NCF medical records, dated "1100" hours on September
14.  The progress note, prepared and signed by Nurse Ryan
Landry, states that Sgt. Wilson notified the nursing staff that
Pickens's appointment had been rescheduled to September 27.  See
Doc. No. 137-10, at 42 (NCF Progress Notes, Sept. 14, 2011)
(Bates No. 000103).  The provision of such notice to the NCF
staff responsible for assessing and addressing Pickens's
evolving medical needs belies the claim that Wilson was
deliberately indifferent to Pickens's medical needs on September
14.  Given the lack of evidence of Wilson's awareness of any
substantial risk of serious harm to Pickens, the district judge
should grant defendants' joint motion for summary judgment on
Claim 3(b)(ii).

## V.   **Howard Kelley**

The remaining defendant in this action, former DOC employee

Howard Kelley, has not been served and has not appeared in this action.  The court notified plaintiff in a status conference on March 27, 2015, that service upon Kelley had to be completed within 120 days.  The court, at plaintiff's request and in consultation with defendants' counsel, took substantial steps to find an address for Kelley that could be used to serve process upon him.  When a subpoena to the New Hampshire State Employee Retirement System, seeking the last known address for Kelley failed to yield an appropriate street address for Kelley, the court in its June 5, 2015, Order (doc. no. 126) ("Service Order"), explained that, for that reason, it was taking no further action as to Kelley.

The 120-day period for Kelley to be served has since passed.  Dismissal without prejudice of all claims asserted against Kelley is thus appropriate at this time, pursuant to Federal Rule of Civil Procedure 4(m).

## Conclusion

For the foregoing reasons, the district judge should grant the motion for summary judgment filed by defendants Judy Baker, Jason Goyette, Keith Griffin, Ralph Jesseman, Robert King, Michael McCann, Edward McFarland, Terry Oliver, Michael Wedge,

and David Wilson (doc. no. 136), as to all claims asserted against them.  All claims asserted against the remaining defendant, Howard Kelley, should be dismissed without prejudice, pursuant to Federal Rule of Civil Procedure 4(m).  Plaintiff's petition for a writ of habeas corpus ad testificandum (doc. no. 168) should be denied as moot, and the Clerk should be directed to enter judgment and close the case.

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  See Garayalde-Rijos v. Mun. of Carolina, 747 F.3d 15, 21-22 (1st Cir. 2014).


_____
Andrea K. Johnstone
United States Magistrate Judge


January 22, 2016

cc:   Ivan Mosi Pickens, pro se
      Lynmarie C. Cusack, Esq.
      Nancy J. Smith, Esq.


39